UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES

        v.

NATHANIEL GATES, JR.,

                    Defendant.

1:17-CR-92 LJV (MJR)

REPORT, RECOMMENDATION
AND ORDER

This case was referred by the presiding judge, the Honorable Lawrence J. Vilardo, to this Court, pursuant to 28 U.S.C. §636(b)(1), to handle all pre-trial matters and to make a recommendation as to all suppression motions.  (Dkt. No. 6)  Before the Court are motions by defendant Nathaniel Gates, Jr. to suppress evidence seized during the execution of a search warrant at 90 Brigham Road, Apt. 17, Fredonia, New York on February 7, 2017 and to suppress evidence recovered pursuant to a search of two cellular telephones.  (Dkt. Nos. 34, 35)  Defendant has also made a number of omnibus discovery demands including a request for an audibility hearing.  (Dkt. Nos. 36, 37)  For the following reasons, it is recommended that defendant's motions to suppress evidence be denied.   The Court's decisions as to defendant's omnibus discovery demands are also set forth in detail below.

## RELEVANT FACTS AND BACKGROUND

In an indictment dated May 11, 2017, defendant was charged with the following: (1) Possession With Intent to Distribute, and Distribution of, Cocaine, on or about January 26, 2017 (in violation of Sections 841(a)(1) and 841(b)(1)(C) of Title 21 of the

United States Code) and (2) Possession with Intent to Distribute, and Distribution of, Cocaine Base, on or about February 2, 2017 (in violation of Sections 841(a)(1) and 841(b)(1)(B) of Title 21 of the United States Code).  (Dkt. No. 5)

On February 21, 2018, defendant filed: (1) a motion to suppress evidence recovered during the execution of a search warrant at 90 Brigham Road, Apt. 17, Fredonia, New York ("Apartment 17") on February 7, 2017; (2) a motion to suppress evidence recovered from the search of two cellular telephones pursuant to search warrants issued on February 16, 2017; (3) a motion for an audibility hearing; and (4) various other omnibus discovery demands.  (Dkt. Nos. 34-38)  On February 23, 2018, defendant filed an affidavit of standing as to both Apartment 17 and the cellular telephones.[1]  (Dkt. No. 38)  The Government filed a response to defendant's various motions on March 7, 2018 and defendant filed a reply on April 4, 2018.  (Dkt. Nos. 39 and 45)  The Court heard oral argument on April 17, 2018.  At that time, the Court granted defendant's request for an evidentiary hearing regarding information contained in the search warrant for Apartment 17, based upon defendant's claim that the search warrant application contained false statements, material misrepresentations and omissions.  *See Franks v. Delaware*, 438 U.S. 154 (1978).

An evidentiary hearing was held before this Court on August 17, 2018 and continued on February 22, 2019.  (Dkt. Nos. 69 and 86)  The Government filed a post-hearing brief on September 5, 2019 and defendant filed a post-hearing brief on

---

[1] Defendant's affidavit states that his brother rented Apartment 17, that defendant had a key to the apartment, that defendant would visit often and sometimes stay overnight, that defendant stored personal items there, that defendant was authorized to exclude others, and that defendant had an expectation of privacy in the apartment. (Dkt. No. 38)  The affidavit further represented that defendant was the lawful owner of the two cellular telephones searched and that he used password protection in order to maintain the privacy of their contents. (*Id.*)  Based upon the facts set forth in defendant's affidavit, the Court finds that defendant has standing to contest the search of Apartment 17 and the cellular telephones.

November 22, 2019.[2] (Dkt. Nos. 99 and 111)  Oral argument was held on December 2, 2019.  Following oral argument, the Court permitted supplemental filings by December 16, 2019 and responses by January 3, 2020, at which time the Court would consider the matter submitted.  (Dkt. Nos. 113 and 114)

## MOTION TO SUPPRESS EVIDENCE FROM SEARCH OF APARTMENT 17

## FINDINGS OF FACT

### *Search Warrant for Apartment 17*

On February 6, 2017, Lieutenant David Bentley, an investigator for the Southern Tier Regional Drug Task Force ("Task Force"), submitted a search warrant application for Apartment 17 to Chautauqua County Court Judge David Foley.  (Dkt. No. 34-1, Exh. A)  The application explained that Bentley and other members of the Task Force utilized a confidential informant ("CI") to make a series of controlled purchases of suspected cocaine and crack cocaine from defendant.  (*Id.*)  In the application, Bentley avers that the CI is reliable, has provided information which proved accurate and truthful, and has conducted prior controlled purchases.  (*Id.*)

The application details the circumstances of three controlled purchases between the CI and defendant.  (*Id.*)  Specifically, on November 23, 2016, Bentley and other officers used the CI to purchase cocaine from defendant in the parking lot of 100 Brigham Road, located a short distance from Apartment 17.  (*Id.*)  The application details that defendant and the CI "engaged in a drug related conversation and [defendant] sold 14.7 ounces of cocaine to the CI".  (*Id.*)  On January 26, 2017, officers

---

[2] Between the conclusion of the evidentiary hearing and the filing of post-hearing briefs, counsel for defendant made a number of motions to extend the filing deadline due to counsel's ongoing health issues.  Defense counsel moved to withdraw from the case because of those health issues on September 16, 2019.  (Dkt. No. 107)  The motion was granted and new counsel was appointed.  (Dkt. Nos. 108 and 109)

observed defendant drive from 90 Brigham Road to meet the CI. (*Id.*) Officers then observed defendant travel back to Apartment 17 at 90 Brigham Road and leave again a short time later. (*Id.*) Defendant then proceeded to 124 Ruggles Street to meet the CI, defendant and the CI engaged in a drug-related conversation, and defendant sold "28.6 ounces of cocaine" to the CI. (*Id.*) Finally, on February 2, 2017, officers again observed defendant exit Apartment 17, meet with the CI, engage in a drug-related conversation and sell the CI "148.8 ounces of cocaine". (*Id.*)

The application further states that prior to each of the controlled purchases, the CI was searched, supplied with government-issued funds, and equipped with an electronic body monitoring/recording device. (*Id.*) A field test was performed on a portion of the suspected cocaine after each purchase and each test was positive for the presence of a controlled substance. (*Id.*) The application states that the "amounts sold during each drug transaction are far greater than the usual cocaine transaction", giving Bentley and the other officers reason to believe that defendant was using Apartment 17 as a stash house for narcotics or other contraband. (*Id.*)

The search warrant was signed by Judge Foley on February 6, 2017 and executed on February 7, 2017. (*Id.*) As a result of the search of Apartment 17, law enforcement seized four bags containing controlled substances. (Dkt. No. 39) Lab testing revealed that the bags contained approximately 92 grams of cocaine, just over 1 gram of crack cocaine, approximately 27 grams of heroin, and approximately 53 grams of U-47700. (Dkt. No. 39)

*August 17, 2018 Evidentiary Hearing*

*Testimony of Lt. Bentley*

During the August 17, 2018 hearing, Bentley testified that he has been a lieutenant with the Chautauqua County Sheriff's Office since 2006 and that he is the lead investigator with the Task Force. (Dkt. No. 69, pg. 5) Lieutenant Bentley testified that he has prepared "a couple hundred" search warrant applications over the course of his career. (*Id.* at 6) Bentley testified that he typically uses a template to prepare the search warrant, delivers the application and provides the issuing judge with a verbal synopsis of the facts. (*Id.* at 7-8) Bentley indicated that he followed this procedure when submitting the February 6, 2017 search warrant application to Judge Foley. (*Id.* at 8)

Lieutenant Bentley testified that the information contained in the application was obtained through his direct participation in three controlled purchases between the CI and defendant. (*Id.* at 7-9) Bentley testified that he directed the CI to contact defendant and arrange purchases of cocaine. (*Id.* at 9, 11-12) Specifically, on November 22, 2016, Bentley instructed the CI to arrange to purchase one ounce of cocaine from defendant the next day. (*Id.* at 11-12, 48) After speaking with defendant, the CI informed Bentley that defendant requested $1400 for the ounce. (*Id.* at 48) Bentley made arrangements to meet the CI the next day to facilitate the transaction. (*Id.*) Bentley testified that while he would prefer to be present when a CI arranges a purchase, it is not always feasible. (*Id.* at 9, 45) For instance here, Bentley was at "the opposite end of the county" when he spoke to the CI about arranging a transaction to occur the next day. (*Id.*) Bentley testified that he did not inform Judge Foley that he did

not monitor the CI when the CI arranged the November 23, 2016 purchase because he did not believe the information was pertinent to Judge Foley's determination. (*Id.* at 10-11) Bentley also testified that by omitting this information, he did not intend to mislead Judge Foley. (*Id.* at 18)

The search warrant application was introduced as Government Exhibit A and shown to Lieutenant Bentley. (*Id.* at 12) Bentley acknowledged that the application refers to the quantities of cocaine involved in the controlled purchases in *ounces*. (*Id.* at 13) Specifically, Bentley confirmed that the application states that defendant sold the CI "14.7 ounces of cocaine" on November 23, 2016; "28.6 ounces of cocaine" on January 26, 2017; and "148.8 ounces of cocaine" on February 2, 2017. (*Id.* at 13) Bentley testified that his use of the term *ounces* was incorrect and that the application should have referred to the weight of the cocaine in *grams* rather than in *ounces*. Bentley further clarified by explaining that the "November 23, 2016 [buy] should have indicated 14.7 grams"; the "January 26, 2017 [buy] should have referred to 28.6 grams"; and the February 2, 2017 [buy] should have indicated 148.8 grams." (*Id.* at 13-14) When asked why the affidavit refers to ounces rather than grams, Bentley testified "[b]ecause I made a mistake, and my officer that was with me that proofread the document didn't catch it, and after we talked to the judge, he did not catch it." (*Id.* at 14) Bentley further testified that by erroneously writing ounces instead of grams, he did not intend to mislead Judge Foley. (*Id.* at 15; 33-34) In fact, Bentley testified that when he spoke with Judge Foley about the search warrant application, they discussed the drug amounts accurately in the form of ounces. (*Id.* at 14-16) Bentley testified that he verbally explained, to Judge Foley, that the first controlled purchase involved approximately half an ounce, the

second controlled purchase involved approximately an ounce and the third controlled purchase involved approximately two ounces as well as an additional three ounces "fronted by defendant".[3]  (*Id.*)

Also during the hearing, Lieutenant Bentley was asked why, in the search warrant application, he represented that Apartment 17 is "known to be occupied" by defendant and is "being utilized" by defendant.  (*Id.* at 21)  Bentley testified that he and other law enforcement officials surveilled Apartment 17 and observed vehicles registered to defendant or known to be used by defendant in the vicinity of the apartment.  (*Id.* at 20)   Bentley further testified that officers regularly observed defendant coming and going from the apartment without assistance in entering, that it appeared defendant had a key to the apartment, and that defendant seemed to have "free reign over the residence."  (*Id.* at 22, 64, 114)  Bentley testified that he believed defendant was using Apartment 17 as a stash house for controlled substances because "when [defendant] was going to make a sale to somebody, [defendant] would pick it up from this location and take it to the individual that was purchasing it[.]"  (*Id.* at 21-22, 114)   When asked why Apartment 17 was referred to in the application as "his [defendant's] apartment", Bentley testified: "I believed [defendant] had enough access to that apartment that it would be easily inferred that it was his apartment, that he was coming and going at will, and that he could use that apartment in any fashion he chose."  (*Id.* at 22)  Bentley testified that at the time he prepared the application he believed that defendant had occupancy at both Apartment 17 as well as other locations in the area, such as the residences of his wife and children or other family members.  (*Id.* at 117)

---

[3] The Court notes that there are approximately 28.3 grams in 1 ounce.  Thus, Bentley's verbal recitation of the drug weights, to Judge Foley, in ounces, correctly corresponds to the drug weights set forth in the affidavit, should those weights had been correctly referred to as grams, rather than ounces.

Bentley testified that he did not intentionally omit or misrepresent any information as to the ownership of Apartment 17 in the search warrant application. (*Id.* at 22-23, 116)

### *Issues Regarding the Scope of Questioning and Testimony of the CI*

During the August 17, 2019 hearing, defense counsel attempted to further cross-examine Lieutenant Bentley regarding the circumstances of each controlled purchase. The Government objected on the grounds that such questioning was outside the intended scope of the hearing and not proper under the standard set forth in *Franks v. Delaware.* Defense counsel countered that because there was reason to believe that none of the controlled purchases described in the warrant application met the criteria or definition of a controlled purchase, the application contained material misrepresentations or omissions which influenced the probable case determination. Defense counsel also requested that the Government produce the CI to testify. The Government again objected, and the Court instructed the parties to brief these issues. (Dkt. Nos. 75, 77, 78) The parties appeared for further oral argument before the Court on November 20, 2018, at which time the Court ruled that defense counsel could cross-examine Lieutenant Bentley as to the circumstances of each controlled purchase. The Court also ordered the Government to subpoena the CI to testify or to provide the CI's contact information to defense counsel. The evidentiary hearing was scheduled to continue on February 20, 2019.

### *February 20, 2019 Evidentiary Hearing*

#### *Production of the CI*

Before appearing for the continued evidentiary hearing, the Government moved for reconsideration of the Court's order requiring testimony from the CI, citing safety

8

concerns. (Dkt. No. 80)  The Government also prepared an affidavit detailing the anticipated testimony of the CI. (Dkt. No. 80, Exh. A; Dkt. No. 86, pgs. 1-16)  At the start of the continued evidentiary hearing, the Court ordered the Government to provide defense counsel with a copy of the affidavit. (*Id.*)  It was agreed that once defense counsel had an opportunity to review the affidavit for use during the hearing, and following the continuation of Lieutenant Bentley's testimony, the parties and the Court would revisit defendant's request to produce the CI. (*Id.*)  Upon conclusion of Lieutenant Bentley's testimony, the Court ruled that testimony from the CI was not necessary and denied defendant's request.[4] (Dkt. No. 86, pg. 131)

### Continued Testimony of Lt. Bentley

During the February 22, 2019 hearing, Lieutenant Bentley testified that, prior to conducting the controlled purchases, the CI was instructed not to engage in any drug deals on his own and not to consume any narcotics. (Dkt. No. 86, pg. 85)  The CI was also told to follow law enforcement directions as closely as possible during the transactions. (*Id.*)  Bentley testified that, during his interactions with the CI, he had no reason to believe that the CI was either under the influence of narcotics or that the CI bought or sold any narcotics other than those involved in the controlled purchases. (*Id.* at 31, 85)

Lieutenant Bentley testified the CI arranged the November 23, 2016 controlled

---

[4] Defendant later renewed his request to call the CI as a witness both orally and in writing. (Dkt. Nos. 83 and 84)  The Court denied the request, finding that in light of safety concerns cited by the Government and after considering the testimony and filings already before the Court, testimony from the CI was not necessary for the Court to determine the issues presented at the evidentiary hearing. (Dkt. No. 84)

purchase over the telephone with defendant the day before, on November 22, 2016.[5] (*Id.* at 92-93)   Bentley testified that the call was recorded and that he recognized defendant's voice based upon past occasions of listening to defendant. (*Id.*)   Prior to the controlled purchase, officers conducted a full body search of the CI as well as his vehicle. (*Id.* at 20-21, 32)   No contraband was found. (*Id.*)   The CI was instructed to meet defendant at a public place. (*Id.* at 27)   Bentley testified that prior to meeting defendant, the CI went into a Walmart for approximately ten minutes during which time he was under surveillance by an officer. (*Id.* at 27-28, 36-37, 39, 97)   The officer observed the CI walk around the store, enter and exit the restroom, and briefly greet another individual. (*Id.*)   The officer did not see anyone else enter or exit the restroom while the CI was present there. (*Id.* at 99)   Further, the CI wore the recording device during the entire time he was in Walmart. (*Id.* at 95)   Bentley testified that he listened to the recording and there was no indication that a drug transaction occurred in Walmart. (*Id.* at 97-99)

Bentley testified that upon leaving Walmart, the CI spoke with defendant and defendant told the CI to meet him at the Brigham Road apartments. (*Id.* at 40)   Officers observed defendant and the CI meet at 100 Brigham Road, which is located near Apartment 17. (*Id.* at 44)   The CI and defendant engaged in a conversation, which was

---

[5] Bentley testified that after the purchase was arranged, he received a call from the CI late in the evening on November 22, indicating that defendant had stopped at the CI's residence unannounced and had given the CI half an ounce of cocaine without payment. (*Id.*; Dkt. No. 86, pg. 86)   Because of the late hour and the distance between Bentley and the CI at that time, Bentley instructed the CI to give Bentley the cocaine the next day, which the CI did. (Dkt. No. 69, pg. 48)   Bentley testified that the CI then completed the transaction the next day, on November 23, by paying for both the half ounce delivered on November 22 and purchasing the second half ounce. (*Id.*)   Bentley testified that he did not use the November 22 exchange as a basis for the search warrant. (*Id.* at 48-49)   He further testified that the CI and defendant were on very friendly terms, and that it was his understanding that it was not unusual for defendant to deliver a portion of drugs to the CI without expecting payment at that time. (Dkt. No. 86, pg. 68-88)   Bentley testified that he had no reason to believe that the CI was being untruthful about the events of November 22. (*Id.*)

recorded, and exchanged a package. (*Id.* at 44-45)  Bentley testified that in the recording, one of the individuals says "you want half", which he understood to mean half an ounce of cocaine. (*Id.* at 102)  Following his exchange with defendant, the CI turned over half an ounce of cocaine to the officers and was again searched. (*Id.* at 34, 45) Bentley testified that they debriefed the CI, who confirmed that he had just met with defendant. (*Id.* at 101)  Bentley testified that while it was not his preference for the CI to enter Walmart between the time he was initially searched and met with defendant, officers cannot control every aspect of a controlled purchase involving an informant. (*Id.* at 46-47)  Bentley also testified that if a CI were to go into a store after the initial search and before the controlled purchase, he would still consider the purchase to be controlled provided law enforcement was continuing to surveille the CI during that time. (*Id.* at 25-26)

The second controlled purchase was scheduled to take place on January 26, 2017 at the CI's residence on Ruggle Street in the City of Dunkirk. (*Id.* at 48, 52) Lieutenant Bentley testified that he observed text messages between defendant and the CI which used coded language to arrange the drug sale. (*Id.* at 104-106)  Bentley testified that he would have preferred the CI not conduct the controlled purchase in his home.  However, he needed to ensure that the transaction proceeded in the same manner the CI and defendant typically conducted business. (*Id.* at 51)  Bentley explained that defendant and the CI had a close friendship, that defendant typically visited the CI's residence, and that a change in this routine might have resulted in suspicion. (*Id.* at 51, 54-55)

Bentley testified that on January 26, 2017, he and other officers met the CI at a predetermined location and searched him. (*Id.* at 47)  Following the search, the CI proceeded to his residence and stayed there for approximately forty minutes. (*Id.* at 48, 50, 52)  Bentley testified that officers did not accompany the CI into his home or search the home because the CI's children were present. (*Id.* at 49)  However, they surveilled the outside of the house during this time. (*Id.* at 108)  Officers observed the CI, who was again wearing a recording device, leave the residence and meet defendant at defendant's vehicle. (*Id.* at 57)  Bentley testified that after listening to the recording and speaking with the CI, he ascertained that the CI gave defendant $1400 and defendant indicated he would return. (*Id.* at 57-58, 109)  The CI then returned to his residence and defendant was surveilled traveling to 90 Brigham Road. (*Id.* at 58-59, 61)  Bentley testified that during this time there was a recorded telephone conversation between defendant and the CI. (*Id.* at 60-61)  During the call, defendant asked the CI if he wanted "hard or soft" and the CI replied "soft", which Bentley understood to mean powder cocaine. (*Id.* at 61, 109-110)  Defendant was then observed going into Apartment 17 for a brief period before returning to Ruggle Street. (*Id.* at 62-63)  Bentley testified that upon defendant's return, the CI exited his residence and engaged in a transaction with defendant where he was given an ounce of cocaine in exchange for the prior payment of $1400. (*Id.* at 63, 110-111)  Following this exchange, the CI immediately went back into his residence for a brief period. (*Id.* at 66)  Bentley testified that while he would have preferred to search the CI immediately after the transaction, he did not anticipate the CI going back into his residence. (*Id.*)  Bentley testified that he reviewed the recordings of the controlled purchase and that there was no reason to

believe that defendant was not the source of the cocaine. (*Id.* at 112) Further, Bentley debriefed the CI after the purchase and the CI confirmed that he gave defendant $1400 and defendant gave him an ounce of cocaine. (*Id.* at 113)

Lieutenant Bentley testified that the CI arranged the third controlled purchase through a telephone call in the presence of law enforcement. (*Id.* at 72, 115) On February 2, 2017, the CI was searched by officers. (*Id.* at 67) He then met defendant in front of his residence on Ruggle Street and entered defendant's vehicle, driven by defendant. (*Id.*) Defendant and the CI stopped a short distance later to pick-up a third individual. (*Id.* at 67-68) Bentley testified that a recording of the interaction in the car reflects defendant discussing the price and amount of drugs. (*Id.* at 115-117) Specifically, defendant states that he is providing approximately 186 grams. (*Id.* at 119) The CI surrendered the narcotics to Bentley at the conclusion of the transaction. (*Id.* at 117) The drugs recovered from the CI were tested and determined to contain 179.9 grams of crack cocaine. (*Id.* at 118-19) Bentley testified that although he was instructed not to do so, the CI entered his residence immediately following the transaction for a brief period of time. (*Id.* at 81-82) The CI was searched after leaving his residence. (*Id.* at 72)

Lieutenant Bentley testified that, based on the totality of the circumstances, he considered each of the three drug buys to be controlled purchases, which is why he described them as such in the search warrant application. (*Id.* at 78, 84, 119) Bentley testified that while there were occasions during the purchases that the CI disregarded his instructions, the CI never lied to him. (*Id.* at 77) Bentley also testified that he

believed the CI to be reliable, based in part on the fact that the CI had previously provided accurate and truthful information to law enforcement. (*Id.* at 77, 107)

After having the opportunity to listen to Lieutenant Bentley's testimony and observe his demeanor on August 17, 2018 and February 22, 2019, the Court finds Bentley to be wholly credible.[6]

## CONCLUSIONS OF LAW

Upon a challenge to a probable cause finding made in a search warrant, a reviewing court must give deference to the issuing judge. *Illinois v. Gates*, 462 U.S. 213, 236 (1969). The court is not to conduct a *de novo* review nor is it to "interpret[] affidavit[s] in a hypertechnical, rather than a commonsense, manner." *Id.* Instead, the role of a reviewing court "is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed." *Id.* at 238 (internal citations omitted). Indeed, warrant affidavits are entitled to "a presumption of validity." *Franks v. Delaware*, 438 U.S. 154, 171 (1978). For these reasons, a defendant is permitted to challenge the veracity of a search warrant in limited circumstances. *United States v. Canfield*, 212 F.3d 713, 717 (2d Cir. 2000). One such circumstance is "where the affidavit in support of the search warrant is alleged to contain deliberately or recklessly false or misleading information." *Id.* An untrue statement in a warrant will not automatically vitiate probable cause. *United States v. Martin*, 157 F.3d 46, 52 (2d Cir. 1998). It is required, however, that all statements in a warrant affidavit be "believed or appropriately accepted by the affiant as true." *Franks*, 438 U.S. at 165.

---

[6] Defendant argues that the description of the controlled purchases in the CI's affidavit (Dkt. No. 80; Exh. A) and Lieutenant Bentley's testimony "differ so markedly that either the CI or Lt. Bentley must be lying about what the CI was permitted to do." (Dkt. No. 113) The Court disagrees with this characterization and finds that the statements contained in the CI's sealed affidavit are consistent with, and further corroborate, Lieutenant Bentley's hearing testimony.

With these principles in mind, the Second Circuit has instructed that in order to suppress evidence obtained pursuant to an affidavit containing erroneous information, a defendant must demonstrate that: "(1) the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth; and (2) the alleged falsehood or omissions were necessary to the [issuing] judge's probable cause finding." *Canfield*, 212 F.3d at 718; *quoting United States v. Salameh*, 152 F.3d 88, 113 (2d Cir. 1998). To determine whether the false information was material to the probable cause determination, a "court should disregard the allegedly false statements and determine whether the remaining portions of the affidavit would support probable cause to issue the warrant." *United States v. Trzaska*, 111 F.3d 1019, 1028 (2d Cir. 1997). Thus, the ultimate inquiry is not whether the affidavit contained false statements or material omissions, "but whether after putting each aside, there remains a residue of independent and lawful information sufficient to support probable cause." *United States v. Ferguson*, 758 F.2d 843, 849 (2d Cir. 1985).

Here, defendant challenges the validity of the February 6, 2017 search warrant on the basis of the following alleged falsities or omissions: (1) the application incorrectly reported the amount of drugs involved in the controlled purchases in ounces rather than grams; (2) the application falsely implied that defendant owned Apartment 17; and (3) the application described the three exchanges between defendant and the CI as controlled purchases even though the exchanges failed to meet the commonly accepted standard for controlled purchases. After having an opportunity to hear Lieutenant Bentley testify regarding the information contained in the application, the Court finds that none of these alleged false statements or omissions were made deliberately or with

a reckless disregard for the truth. Further, the Court finds that none of the alleged falsities or omissions were material to Judge Foley's probable cause determination. The Court now addresses each of defendant's arguments in turn.

*Drug Amounts*

It is undisputed that the search warrant application contained an inaccurate statement as to the weight of drugs involved in the controlled purchases on November 23, 2016, January 26, 2017 and February 2, 2017. Indeed, Lieutenant Bentley testified that his application incorrectly stated the weight of cocaine involved in each purchase as *ounces*, when the weight should have been stated as *grams*. However, Bentley credibly testified that, in each instance, his use of the word ounces was a typographical error, and that he did not intend to mislead Judge Foley or to exaggerate the amount of drugs involved in the controlled purchases. Bentley's characterization of the error as typographical is supported by testimony that he used a template to draft the application. The unintentional nature of the mistake is also corroborated by Bentley's credible testimony that he orally reported the correct weights of the cocaine involved to Judge Bentley when they were discussing the warrant application. Indeed, Bentley testified that before Judge Foley signed the warrant, he informed Judge Foley that the first purchase involved approximately half an ounce of cocaine, the second purchase involved approximately one ounce of cocaine and that the third purchase was intended to involve approximately two ounces but that the defendant "fronted" an additional three ounces. Bentley's correct verbal recitation of the drug weights belies any claim that the statements in the application were a purposeful or deliberate attempt to mislead the issuing judge. Thus, the Court concludes that Lieutenant Bentley's incorrect use of the

term ounces in the warrant application was not done intentionally or with a reckless disregard for the truth. *See United States v. Markey*, 131 F. Supp 2d 316, 324; *aff'd* 69 F. App'x 492 (2d Cir. 2003) (with respect to the first prong of the *Franks* analysis, "[t]he focus is not on whether a mistake was made, but rather on the intention behind the mistake.") (internal citations omitted); *United States v. Williams*, 350 F. Supp. 3d 261, 272 (WDNY 2018) (incorrect statements in the warrant application, including that the premises contained heroin, were "overlooked boilerplate language akin to typographical errors" and did not amount to false statements).

Further, even if there was evidence that Bentley deliberately or recklessly inflated the drug weights, defendant's motion would still fail based on the second prong of the *Franks* analysis. In other words, the Court finds that the incorrect drug weights in the application were not material to Judge Foley's finding of probable cause to search Apartment 17. To begin, there is credible evidence in the record that before Judge Foley signed the search warrant, Bentley verbally explained the accurate amounts of cocaine involved in each controlled buy. Thus, Judge Foley was informed that the three controlled buys involved a half ounce of cocaine, an ounce of cocaine and approximately five ounces of cocaine respectively, even though the application stated otherwise. Further, should the Court remove the incorrect weights and substitute the correct measurements, the affidavit would still contain probable cause that narcotics or other contraband would be found at Apartment 17. Indeed, a corrected application would state that: (1) on November 23, 2016 defendant met the CI in the vicinity of Apartment 17 and sold the CI 14.7 grams of cocaine; (2) on January 26, 2017 defendant was observed entering and existing Apartment 17 and shortly thereafter sold

28.6 grams of cocaine to the CI; and (3) on February 2, 2017 defendant left Apartment 17, met the CI, and sold 148.8 grams of cocaine to the CI. These statements, combined with the other facts set forth in the application, would have provided an ample basis for Judge Foley to issue the search warrant. The Court rejects defendant's argument that the smaller, correct drug measurements would not have supported a probable cause finding because they would have been indicative of personal use as opposed to distribution. As just described, the warrant application presented specific evidence that defendant not only possessed cocaine, but that he also sold cocaine to the CI on three occasions. The fact that the sales involved less cocaine than stated in the warrant application is immaterial.

### *Defendant's Ownership of Apartment 17*

Defendant next argues that the search warrant contained material misrepresentations because it falsely implied that defendant owned or occupied Apartment 17. To begin, the Court finds that Bentley did not make any material misrepresentations or false statements in the warrant application with respect to defendant's connection to Apartment 17. Bentley never stated to Judge Foley, either verbally or in writing, that defendant owned Apartment 17. Instead, the search warrant application refers to Apartment 17 as "his [defendant's] apartment" and states that defendant occupied the apartment. These statements are accurate based upon Bentley's knowledge at the time he applied for the search warrant. Bentley credibly testified that officers conducted surveillance of Apartment 17 and observed vehicles belonging to or used by defendant in the vicinity of the apartment. Officers regularly observed defendant freely coming and going from Apartment 17 such that he appeared

to have a key and "free reign" over the residence. Indeed, Bentley credibly testified that when he prepared the search warrant application, he believed that defendant had occupancy of Apartment 17 as well as the residences of other family members. Bentley explained that because defendant was "coming and going at will" and using the apartment "in any fashion he chose", it could be inferred that Apartment 17 was defendant's apartment. *See United States v. Lee*, 07 Cr. 003, 2010 U.S. Dist. LEXIS 147602 (SDNY Jan. 10, 2010) (rejecting defendant's argument that the search warrant affidavit failed to allege a sufficient connection between defendant and the premises to be searched where there was "detailed evidence tying [defendant] to Apartment 3, including multiple sightings of his car in the area and a witness statement indicating that [defendant] had stayed overnight on at least one occasion" as well as officer's explanation as to why, based on training and experience, he believed narcotics-related evidence would be found there).

Likewise, defendant contends that there was no reasonable basis for Bentley to aver, in the warrant application, that defendant utilized and occupied Apartment 17 for the "sale, storage, production, and distribution of crack cocaine." The Court rejects this argument based upon both the information contained in the warrant application and the credible hearing testimony. There is evidence in the record that during the controlled purchases on January 26, 2017 and February 2, 2017, defendant was observed leaving directly from Apartment 17 to meet the CI and engage in a drug sale. There is evidence that on January 26, defendant met the CI, accepted $1400, immediately went to Apartment 17, and immediately returned to meet the CI with a quantity of cocaine. Indeed, in a recorded call between defendant and the CI while defendant was traveling

to Apartment 17, defendant asked the CI if the CI wanted "hard or soft", which Bentley understood to mean crack or powder cocaine.   The November 23, 2016 controlled purchase occurred a short distance from Apartment 17.   Thus, the Court finds that Bentley's investigation of defendant and his observations of the controlled purchases provided a legitimate basis for his statement, in the application, that he believed defendant was using Apartment 17 in furtherance of drug distribution.   *See United States v. Singh,* 390 F.3d 168, 182 (2d Cir. 2004) (a sufficient showing of nexus between the alleged criminal activities and place to be searched "does not require direct evidence and may be based on reasonable inference from the facts presented based on common sense and experience") (internal citations omitted); *United States v. Stewart*, 3:17-CR-00072, 2019 U.S. Dist. LEXIS 78376 (D. Conn. May 9, 2019) ("Probable cause to search a location for contraband following a sale of narcotics may be established by observations of the seller going to the location immediately before or after the sale.")[7]

### *Description of the Three Drug Buys as "Controlled Purchases"*

Defendant  argues  that  the  warrant  application  contained  material misrepresentations and omissions because it failed to recount specific aspects of the three purchases that were not "controlled".   Defendant points specifically to: (1) the fact that the CI went into a Walmart in between the initial search and the controlled purchase on November 23, 2016 and that defendant dropped-off half an ounce of cocaine to the CI, unexpectedly, the night before the controlled purchase; (2) the fact that the CI was in his  home,  unmonitored,  for  an  extended  period  of  time  during  the  course  of  the

---

[7] The Court also notes that, even if the search warrant application expressly stated that defendant did not own Apartment 17, probable cause would still have existed to search based upon the warrant application's description of the nexus between defendant's alleged distribution activities and Apartment 17.

controlled purchase on January 26, 2017, including immediately after the transaction; and (3) that a third individual was present for the controlled purchase on February 2, 2017 and that the CI entered his residence immediately after the transaction and before officers searched him.

To begin, the Court finds that Lieutenant Bentley's failure to include the details cited by defendant does not constitute a deliberate falsehood or reckless disregard for the truth. *See United States v. Vilar*, 05-CR-621, 2007 U.S. Dist. LEXIS 26993 (SDNY April 5, 2007) (One "recklessly disregards the truth when one makes allegations while entertaining serious doubts about the accuracy of those allegations[.]") (internal citations and quotations omitted). Bentley credibly testified that, based upon the totality of the circumstances, he believed that each of the three purchases met the standard of a controlled purchase and that defendant was the source of the cocaine. Those circumstances included: (1) officers' surveillance of both the CI and defendant's actions during the controlled buys; (2) searches of the CI before and after the purchases; (3) recordings of the purchases and text messages between defendant and the CI; and (4) the CI's statements that defendant provided him cocaine in exchange for payment on each occasion. Importantly, Bentley testified that while the CI may have failed to follow some of his instructions during the controlled purchases, the CI never lied to him. Further, Bentley testified that he considered the CI reliable because the CI had provided accurate information in the past. During the hearing, Bentley conceded that some aspects of the controlled purchases did not go as planned. Indeed, the Court acknowledges that some of the procedures could have been improved upon. However, after listening to the hearing testimony, the Court finds that, at the time Bentley applied

for the search warrant, he believed that the purchases were sufficiently controlled, and that defendant sold the cocaine to the CI. Based upon the totality of circumstances just discussed, Bentley had no reason to doubt the accuracy of this belief. Thus, there is no basis for the Court to conclude that, by failing to include every detail of the purchases, Lieutenant Bentley was attempting to mislead the issuing judge as to the nature and circumstances of the controlled purchases. *See United States v. Awadallah*, 349 F.3d 42, 67-68 (2d Cir. 2003) ("An affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation.") (internal citations and quotations omitted).

Moreover, the Court finds that even if the application had included every detail of the controlled purchases, including instances where the CI was not monitored or did not follow officers' instructions, the application would still have contained probable cause to search Apartment 17 for evidence of drug distribution.[8] Probable cause to issue a search warrant exists where there is a "fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Here, the application accurately explains how, on January 26, 2017 and February 2, 2017, officers observed defendant leave Apartment 17, travel to meet the CI, engage in a drug-related conversation and sell cocaine to the CI. During the January 26 purchase specifically, defendant was observed leaving Apartment 17, traveling to meet the CI, accepting a sum of money, returning to Apartment 17, and then returning to meet the CI to provide cocaine. The application states that on November 23, 2016, defendant sold

---

[8] "If an affidavit can be challenged because of material omissions, the literal *Franks* approach no longer seems adequate because, by their nature, omissions cannot be deleted. ... A better approach, therefore, would be to delete false or misleading statements and insert the omitted truths revealed at the suppression hearing." *United States v. Ippolito*, 774 F.2d 1482, n. 1 (9th Cir. 1985)

cocaine to the CI a short walk from Apartment 17. The application explains how defendant and the CI engaged in drug-related conversations on each occasion.[9] The application indicates that the CI has provided accurate and truthful information in the past and has conducted prior controlled purchases. This information, taken in its totality, supports a probable cause finding that contraband or evidence of a crime would be found at Apartment 17. The omitted details include instances during the purchases where the CI was not constantly monitored, another individual was present during the purchase, the defendant dropped-off narcotics to the CI unexpectedly, or the CI returned to his residence immediately after the purchase and before officers had an opportunity to search him. Defendant argues that the addition of these details would have affected the probable cause determination because they suggest that defendant was not the source of the cocaine. The Court disagrees. Considering these discrepancies in light of the totality of information contained in the search warrant, it is highly unlikely that the cocaine came from a source other than defendant. While the discrepancies demonstrate that the controlled purchases were not perfect and would likely be relevant cross-examination material at trial, they do not negate probable cause. To be sure, probable cause does not require that every inkling of doubt be resolved in favor of a defendant. *See United States v. Gaskin*, 364 F.3d 438, 457 (2d Cir. 2004) ("The standard does not demand certainty but only a 'fair probability' that contraband or evidence of a crime will be found."); *Gates*, 462 U.S. at 246 (The standard for "probable cause does not demand the certainty we associate with formal trials.")

---

[9] The Court finds that the application's use of "drug-related conversations" was accurate based upon Bentley's hearing testimony describing his review of the recordings of the controlled purchases and his conversations with the CI.

For these reasons, the Court recommends that defendant's motion to suppress evidence recovered as a result of the search of Apartment 17 be denied.

## MOTION TO SUPPRESS SEARCH OF CELLULAR TELEPHONES

Defendant moves to suppress evidence recovered from two cellular telephones found in the vehicle operated by defendant at the time of his arrest. (Dkt. No 35) The telephones were searched pursuant to warrants signed by a Chautauqua County Court judge on February 16, 2017. (Dkt. No. 35; Exhs. A, B) Defendant argues that the applications in support of the warrants were "bare bones" and "lacked an indicia of probable cause." (*Id.*)

A search warrant issued by an impartial magistrate is presumptively valid. *United States v. Smith*, 9 F.3d 1007, 1012 (2d Cir. 1993). Where, as here, the Court is reviewing the probable cause determination of an independent magistrate, it asks solely "whether the issuing judicial officer had a substantial basis for the finding of probable cause." *United States v. Wagner*, 989 F.2d 69, 72 (2d Cir. 1993). Doubts regarding the existence of probable cause should be resolved in favor of upholding the search warrant. *United States v. Travisano*, 724 F.2d 341, 345 (2d Cir. 1983); *Gates*, 462 U.S. at 236 (deference is to be given to the issuing judge).

Here, the search warrant applications explain that officers stopped defendant's vehicle to execute a valid arrest warrant, which charged defendant with narcotics-related felonies. (Dkt. No. 35; Exhs. A, B) At that time, officers observed the phones in plain view in the vehicle. (*Id.*) The petitioning officer avers that "[b]ased upon [his] thirty seven years as a police officer and fourteen years with the Southern Tier Regional Drug Task Force, it is my experience that people involved in trafficking narcotic[] substances

use their cellular phones to store information pertaining to their narcotics trafficking."
(*Id.*) The Court, having reviewed the search warrants in their totality, finds no reason to question the issuing magistrate's finding of probable cause based upon these statements. *See United States v. Hoey*, 15-CR-229, 2016 U.S. Dist. LEXIS 7261 (SDNY Jan. 21, 2016) ("Courts have commonly [sic] found probable cause to search cellphones possessed by defendants arrested in connection with ongoing drug-distribution crimes based on the experience of agents familiar with narcotics trafficking that traffickers commonly use cellphones to communicate in the course of their narcotics distribution, as well as to store relevant information, including the names and contact information of suppliers, purchasers, and confederates."); *United States v. Delva*, 13 F. Supp. 3d 269 (SDNY 2014) ("The association between narcotics trafficking (for which [defendant] was initially arrested) and cell phones has been long established—cell phones can store information and images relating to the crime and participants in that crime (that is, who bought and sold the drugs).".

Thus, the Court recommends that defendant's motion to suppress evidence recovered from the search of the cellular telephones be denied.

## OMNIBUS DISCOVERY MOTIONS

Motion for an Audibility Hearing

Defendant moves for an audibility hearing which respect to audio and video recordings of the controlled purchases on January 26, 2017 and February 2, 2017. (Dkt. No. 36)  Defendant indicates that significant portions of the recordings are inaudible due to background music as well as problems with the recording device.

Alternatively, defendant requests that the Government prepare transcripts of the audio or video recordings it intends to use at trial.

During oral argument on April 17, 2018, the Court instructed the Government to prepare transcripts of the recordings and to provide the transcripts to defendant and the Court, which the Government did. The Court finds that because the purpose of an audibility hearing is to determine whether particular evidence may be introduced to the jury at trial, defendant's motion should be determined by the District Court. Thus, defendant's motion is denied without prejudice to renew his request for an audibility hearing before Judge Vilardo at the time of trial.

### Rule 16 Discovery

Defendant moves for discovery pursuant to Rule 16 of the Federal Rules of Criminal Procedure, which requires that the Government disclose evidence and information upon request of a defendant. (Dkt. No. 37) While Rule 16 was intended to provide for liberal discovery, a defendant is not entitled to discovery of "the entirety of the government's case against him." *United States v. Percevault,* 490 F.2d 126, 130 (2d Cir. 1974). Rule 16 provides that a defendant is entitled to the following: (1) a defendant's written, recorded or oral statements in the possession of the government; (2) the defendant's prior record; (3) documents, objects, books, papers, photographs, etc. that will be used during the government's case-in-chief; (4) reports of examinations or tests; (5) and information about expert witnesses in accordance with Federal Rules of Evidence 702, 703 and 705. *See* Fed. R. Crim. P. 16(a)(1). Rule 16 specifically exempts from disclosure "reports, memorandum, or other internal government

documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case." *See* Fed. R. Crim. P. 16(a)(2).

Specifically, defendant requests the data underlying various chemical analysis reports for the substances involved in the controlled purchases and disclosure of expert witness information. The Government indicates that it has fully complied with Rule 16 and that it has ordered the requested chemical analysis reports, which will be provided to defendant.

Based upon the representations made by the Government, including that it will continue to provide discoverable evidence as it becomes available, the Court finds that the Government has complied with Rule 16. The Government is reminded that its disclosure obligations continue up through and during trial. *See* Fed. R. Crim. P. 16(c). Further, the Government is expected to comply with all requirements in Rule 16, Federal Rules of Evidence 702, 703, and 705, and Judge Vilardo's pretrial order as they apply to expert testimony.

### *Request for Witness Identification*

Defendant also requests the identity of an individual who was present or spoke with defendant around the time of the controlled purchase on February 2, 2017. (Dkt. No. 37) Defendant requests the identity of this individual so that he may interview him and pursue any potential leads. The Government argues that this individual is not a potential witness and that defendant is likely aware of the individual's identity because the individual was present in his residence.

During oral argument on April 17, 2018, the parties had further discussion as to this request. The Government contended that the individual's identity was not relevant

and that it had safety concerns with respect to releasing the identity. The Court indicated that, at this time, it could not be stated that this individual did not have relevant information, since they were present and may have observed something around the time of the controlled purchase. If this individual was a witness to events relevant to the controlled purchase, defendant would have a right to interview them and call them as a witness. For these reasons, the Court will grant defendant's request for disclosure of the individual's identity. Should the Government have specific safety concerns, the Government may propose a protective order.

### *Disclosure of Evidence Pursuant to Rules 404(b), 608 and 609*

Defendant moves for disclosure of any evidence of prior crimes or bad acts the Government intends to introduce at trial pursuant to Federal Rule of Evidence 404(b). (Dkt. No. 37) Defendant also moves for pretrial disclosure of impeachment evidence pursuant to Federal Rules of Evidence 608 and 609. (*Id.*)

The Government is required to provide "reasonable notice in advance of trial" of the general nature of prior uncharged crimes or bad acts it intends to introduce against a defendant. *See* Fed. R. Evid. 404(b). Rule 608 of the Federal Rules of Evidence does not contain the same pretrial notice requirement. Based upon the Government's representation that it will disclose bad act or impeachment evidence prior to trial and in accordance with the pretrial order issued by the District Court, defendant's motion is denied as moot. The issue of admissibility of evidence pursuant to Federal Rules of Evidence 404(b), 608 and 609 is left to the determination of Judge Vilardo at the time of trial.

_Brady, Giglio and Jencks Material_

Defendant moves for the disclosure of any favorable, exculpatory or impeachment materials pursuant to _Brady_, _Giglio_ and their _progeny_. (Dkt. No. 37) "[A]s a general rule, Brady and its progeny do not require immediate disclosure of all exculpatory and impeachment material upon request by a defendant." _United States v. Coppa_, 267 F.3d 132, 146 (2d Cir. 2001). "[A]s long as a defendant possesses Brady evidence in time for its effective use, the government has not deprived the defendant of due process of law simply because it did not produce the evidence sooner." _Id._ at 144.

Here, the Government acknowledges its affirmative duty to provide defendant with exculpatory evidence, as well as evidence the defense might use to impeach witnesses at trial. The Government further indicates that it has disclosed all _Brady_ material in its possession, and that it will continue to disclose such information should further _Brady_ materials be discovered. The Government agrees to provide _Jencks_ and impeachment (_Giglio_) material, including grand jury testimony, witnesses' beneficial treatment by the Government, written statements of witnesses, and law enforcement memorandum of interviews with witnesses no later than two weeks prior to trial or as ordered by the District Court. Given the Government's representations, defendant's motion to compel the production of _Brady/Giglio_ material is denied as moot. Consistent with _Coppa_, the Government is reminded of its continuing obligation to timely disclose any _Brady_ and _Giglio_ material to defendant. _See United States v. Padovani_, No. 14-CR-00224, 2016 WL 5402696, at *4 (WDNY Sept. 28, 2016).

*Preservation of Rough Notes*

Defendant moves for an order requiring all federal, state or local agents and officers who participated in the investigation to retain and preserve all rough notes taken as part of their investigation, whether or not the contents of the notes are incorporated in official records, as well as any notes made by Government witnesses.  (Dkt. No. 37) The Government responds that it agrees to preserve all rough notes.  The Court grants defendant's motion and directs the Government to arrange for the preservation of all rough notes.

*Government's Motion for Reciprocal Discovery*

The Government moves for reciprocal discovery under Federal Rule of Criminal Procedure 16(b) including the opportunity to inspect, copy or photograph books, papers, documents, photographs, tangible objects or copies or portions thereof which are in the possession, custody or control of defendant and which defendant intends to introduce as evidence at trial, the results or reports of any physical or mental examinations or scientific tests or experiments made in connection with the case, and a written summary of any expert witness testimony. (Dkt. No. 39)  The Government's motion for reciprocal discovery is granted and defendant is reminded that his disclosure obligations continue up through and during trial. *See* Fed. R. Crim. P. 16(c).

## CONCLUSION

For the foregoing reasons, it is recommended that defendant's motions for suppression of evidence (Dkt. Nos. 34, 35) be denied. It is ordered that defendant's omnibus discovery demands (Dkt. Nos. 36, 37) are decided in the manner detailed above and that the Government's request for reciprocal discovery is granted.

Pursuant to 28 U.S.C. §636(b)(1), it is hereby ordered that this Report, Recommendation and Order be filed with the Clerk of Court.

Unless otherwise ordered by Judge Vilardo, any objections to the recommendation portion of this Report, Recommendation and Order must be filed with the Clerk of Court within fourteen days of service of this Report and Recommendation in accordance with the above statute, Rules 59(b), 45(a), and 45(c) of the Federal Rules of Criminal Procedure, and Local Rule of Criminal Procedure 59. Any requests for an extension of this deadline must be made to Judge Vilardo.

**Failure to file objections, or to request an extension of time to file objections, within fourteen days of service of this Report, Recommendation and Order WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.** See *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989).

The District Court will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the Magistrate Judge in the first instance. *Pursuant to Local Rule of Criminal Procedure 59(c)(2), written objections "shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority."* **Failure to comply with these provisions may result in the District Court's refusal to consider the objection.**

**SO ORDERED**.


Dated:  February 5, 2020
        Buffalo, New York


_____
MICHAEL J. ROEMER
United States Magistrate Judge